## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION

| | |
|---|---|
| **KUNAL KHIYANI,** ) | **CASE NO.** 4:25-CV-114-GNS |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **VERIFIED COMPLAINT** |
| **ALLIED ADULT DAY CARE, LLC,** ) | **FOR INJUNCTIVE AND OTHER** |
| **d/b/a ALLIED BILLING COMPANY** ) | **RELIEF** |
| Serve:  Allied Adult Day Care, LLC ) | |
| Attn:  Stephen Bryson ) | |
| 1020 Halifax Drive ) | |
| Suite 102 ) | |
| Owensboro, KY 42301 ) | |
| ) | |
| **STEPHEN BRYSON, and** ) | |
| Serve:  Stephen Bryson ) | |
| 1020 Halifax Drive ) | |
| Suite 102 ) | |
| Owensboro, KY 42301 ) | |
| ) | |
| ) | |
| **KIMBERLY BRYSON.** ) | |
| Serve:   Kimberly Bryson ) | |
| 7181 Boston Laffoon Rd. ) | |
| Philpot, KY 42366 ) | |
| ) | |
| **Defendants.** ) | |

**\* \* \* \* \***

Plaintiff, Kunal Khiyani ("Khiyani"), for his Verified Complaint for Injunctive and Other

Relief ("Complaint") against the Defendants, Allied Adult Day Care, LLC d/b/a Allied Billing

Company ("Allied"), Stephen Bryson ("Stephen"), and Kimberly Bryson ("Kimberly"),

(together, "Brysons"), states as follows:

25058297.v3

## I.      NATURE OF THE CASE

1.      In this civil action, Khiyani seeks relief from the Defendants' numerous violations of the parties' Equity Purchase Agreement ("Agreement"), including injunctive relief for the Defendants' breaches of the Agreement's restrictive covenants. These violations are seriously and irreparably harming Khiyani's business.[1] In sum, the Brysons sold Khiyani their membership interests in three western Kentucky Home Instead® franchises: Devoted Senior Care, LLC ("Devoted"), Legacy Senior Care, LLC ("Legacy"), and Noble Senior Care, LLC ("Noble") (collectively, the "Companies") for over ▮▮▮▮▮ at closing, a ten-year promissory note for an additional ▮▮▮▮▮ plus interest, and ▮▮▮▮▮ annually in a long-term lease for Devoted to occupy real property that the Brysons own via another entity. In exchange, the Brysons made certain representations and agreed to be bound by restrictive covenants that prohibit them from competing with, soliciting, or otherwise diverting business away from the Companies. After pocketing millions from the sale of the Companies and securing the other substantial financial benefits, the Brysons have begun to violate the Agreement by expanding their self-described Medicaid "billing company," Allied, to compete with the Companies and to divert away Khiyani's Medicaid clients and caregivers, including by causing a significant decrease in the Companies' Medicaid business and referrals received from Medicaid case managers (many of whom are now employed by Allied). As set forth in more detail below, Khiyani seeks relief due to the Brysons:

> i.      Soliciting, servicing, and diverting the Companies' caregivers, Medicaid clients and business, in violation of the restrictive covenants contained in the Agreement;

---

[1] The Equity Purchase Agreement is attached as Exhibit 1.

ii.    Misappropriating and disclosing the Companies' confidential and proprietary trade secrets, and using them to Khiyani's detriment, in violation of the Agreement;

iii.    Engaging in other unlawful conduct toward Khiyani including, but not limited to, tortiously interfering with the Companies' business relations and prospective business relations, and unfairly competing; and

iv.    Conspiring with Allied in each of the unlawful activities set forth above.

2.    Khiyani also seeks relief due to Allied:

i.    Tortiously interfering with the Agreement and Khiyani's rights under the same;

ii.    Tortiously interfering with the Companies' business relations and prospective business relations;

iii.    Misappropriating the Companies' trade secrets; and

iv.    Engaging in other unlawful conduct toward Khiyani, including, but not limited to, conspiring with the Brysons to commit the same.

3.    In sum, the Defendants' actions materially violate the Agreement, deprive Khiyani of a primary benefit of the Agreement, and drastically alter the Companies' competitive circumstances in their territory. Because of Defendants' actions, the Companies' Medicaid operations are rapidly declining. For example, the Companies' Medicaid operations are down nearly 20-30% compared to last year, and Devoted alone lost approximately seven percent of its revenue in just one week last month due to the actions of the Brysons and Allied. Khiyani, therefore, seeks injunctive relief to enforce the Agreement pending a full adjudication of the dispute between the parties and a determination of final relief.

## II.    THE PARTIES AND JURISDICTION

4.    Khiyani is a resident of Miami-Dade County, Florida.

25058297.v3        3

5.     Allied is a Kentucky limited liability company with its principal place of business located at 1020 Halifax Dr., Suite 102, Owensboro, KY, 42301. Upon information and belief, all of Allied's member(s) are residents of Kentucky.

6.     Stephen is a resident of Daviess County, Kentucky, a former member and owner of the Companies, and the owner, organizer, and member of Allied.

7.     Kimberly is a resident of Daviess County, Kentucky, and a former member and owner of the Companies.

8.     There is complete diversity of citizenship between Khiyani and all of the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Therefore, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

9.     Furthermore, this Complaint is being filed in the United States District Court for the Western District of Kentucky in the Paducah Division pursuant to section 7.4 of the Agreement as well as 28 U.S.C. § 1391 (a)(2), because personal jurisdiction exists over Defendants, who are residents of or do business in western Kentucky, and a substantial majority of the events, acts and/or omissions giving rise to the claims occurred in or from Defendants' conduct within western Kentucky.

### III.     STATEMENT OF FACTS

#### A.     Background Of The Parties

10.     The Companies are Home Instead®, Inc. ("Home Instead") franchise businesses. Home Instead is a provider of in-home care services for individuals, a significant portion of whom receive Medicaid services. The Companies' in-home care services include personal assistance services (*e.g.*, assistance with bathing, grooming, dressing, personal hygiene), non-medical care services (*e.g.*, medication reminders, glucose checks, or wound care), companionship, home help such as light housekeeping, meal preparation, errands, transportation

services, and Alzheimer's and dementia care (collectively, "In-Home Care Services"). These In-Home Care Services allow individuals who would otherwise require care in a nursing facility or other institution to receive care in their own homes.

11.     While the Companies do not exclusively service Medicaid clients, the majority of their business derives from Medicaid as the payor of In-Home Care Services.

12.     Specifically, an individual in need of assistance works with a case manager to qualify for Medicaid reimbursed In-Home Care Services. A case manager helps individuals navigate the complexities of the Medicaid program, access the healthcare, social services, and other resources they need. These case managers assess and determine eligibility and functional needs for assistance, and they develop a personalized plan to coordinate the necessary services.

13.     Case managers then refer qualified individuals to Medicaid licensees to implement the personalized plan.

14.     From 2010 until April of 2023, the Brysons owned and operated the Companies pursuant to their Franchise Agreements with Home Instead.

15.     Although the Companies serve Medicaid clients, they do not directly hold a Medicaid license. Rather, due to Medicaid's regulatory structure, the Companies are subcontractors for Medicaid licensees, providing In-Home Care Services to the Medicaid providers' clients.

16.     In or around March 8, 2019, the Companies, under the Brysons' ownership, contracted with Heartsong Memory Care, LLC d/b/a Heartsong Adult Day Health Care

("Heartsong"), a Medicaid licensee, to provide In-Home Care Services for Heartsong's clients. In exchange, Heartsong performed Medicaid billing and oversight for the Companies.[2]

17. Nearly four months later, on July 12, 2019, while the Brysons were the owners of the Companies, they formed Allied.

18. Allied's corporate filings with the Kentucky Secretary of State reflect that Stephen has been an officer, member, and manager of Allied since its formation.

**B.   The Brysons' Sale of the Companies to Khiyani Pursuant to the Agreement**

19. In 2023, the Brysons publicly advertised the sale of the Companies.

20. As part of and during the due diligence and sale process, the Brysons made disclosures and representations regarding the Companies to Khiyani, including regarding the financial condition of the Companies, the operations of the Companies, and the nature of Allied's business, all of which Khiyani relied upon.

21. Specifically, the Brysons' representations and disclosures of the companies' financial condition and financial records during the due diligence process provided the basis to determine the Companies' earnings before interest, taxes, depreciation and amortization (EBITDA), which was in turn used to calculate the sales price for the Companies.

22. In April of 2023, the Brysons and Khiyani executed the Agreement for the Brysons to sell all of the membership interests in the Companies to Khiyani for:

> i.  A ██████ cash payment at closing (*see* Agreement at § 1.2(a)), which was largely financed through a personally guaranteed SBA loan;

---

[2] In 2016, Devoted, under Bryson's ownership, also contracted with Horizon Adult Health Care, LLC ("Horizon"). Horizon initiated litigation against Devoted for violating contractual restrictive covenants. *See Horizon Adult Health Care, LLC v. Devoted Senior Care*, 19-CI-00563 (Madison Co. Cir. Ct.). Tellingly, this litigation was dismissed just days prior to the sale.

    ii.    A ten-year promissory note for an additional ▮▮▮▮ plus interest, which was guaranteed and secured by the Companies (*see* Agreement at § 1.2(b));

    iii.    Over ▮▮▮▮ annually in a long-term lease for Devoted to occupy real property that the Brysons own via other entities (*see* Agreement at § 5.2(e)), which is personally guaranteed;

23. Pursuant to Article 3 of the Agreement, the Brysons expressly represented and warranted to Khiyani, among other things, that:

    i.    The financial statements provided to Khiyani, including but not limited to the balance sheets, were true, complete, and accurate in all material respects and fairly presented the financial condition of the Companies as of the dates indicated (Agreement at § 3.5);

    ii.    There had been no material adverse changes in the financial condition of the Companies between the date of the most recent balance sheet and the closing date (Agreement at § 3.5);

    iii.    The Companies had no liabilities or obligations, whether accrued, absolute, contingent, or otherwise, except as disclosed in the financial statements or otherwise disclosed in writing to Khiyani prior to closing (Agreement at § 3.7); and

    iv.    The Companies were in compliance with all legal requirements (Agreement at § 3.8).

24. In reliance on these representations and warranties, among other things, Khiyani proceeded with the purchase of the Companies at the agreed-upon purchase price.

25. Furthermore, in order to protect the valuable membership interest that Khiyani acquired from the Brysons and as material inducement for the purchase, the Brysons, in turn, agreed to:

    i.    Indefinitely maintain the confidentiality of the Companies' proprietary information (Agreement at § 4.2), and

    ii.    A ten-year covenant not to compete, solicit, or divert business or employees within the Companies' exclusive territories (Agreement at § 4.3) (collectively, the "Restrictive Covenants").

25058297.v3

7

26.     More specifically, section 4.2 of the Agreement obligates the Brysons to "treat and hold as confidential any information concerning the business of the [Companies] that is not already generally available to the public," and to "refrain from using any of the Confidential Information" after closing. *See* Agreement at § 4.2.

27.     Section 4.3(a) of the Agreement prohibits the Brysons for a ten-year period from, *inter alia*: (i) "engag[ing] in any Restricted Business" within the Companies' franchise territories; (ii) "request[ing] or advis[ing] any customer" to withdraw business from Khiyani or the Companies; (iii) "solicit[ing] or divert[ing]" any Restricted Business from the Companies; and (iv) "solicit[ing] for employment" any staff, including caregivers of the Companies except with respect to one specific employee. *See id.* at § 4.3.

28.     The Agreement defines "Restricted Business" as the provision of "in-home non-medical care and personal assistance services to seniors, including but not limited to companionship, personal hygiene assistance, light housekeeping, meal preparation, errands, transportation, medication reminders, and Alzheimer's or dementia care." *See id.* at § 4.3. In other words, Restricted Business is the equivalent of In-Home Care Services.

29.     The Companies' exclusive franchise territories are set forth in the Franchise Agreements with Home Instead as the following 24 Kentucky counties: Union, Henderson, Daviess, Hancock, Ohio, Livingston, Crittenden, Webster, McLean, Lyon, Caldwell, Hopkins, Trigg, Christian, Muhlenberg, Todd, Ballard, McCracken, Marshall, Calloway, Graves, Carlisle, Hickman and Fulton (collectively, the "Western Kentucky Market"). *See* excerpts of the Franchise Agreements, attached as Exhibit 2.

30.     When the Brysons entered into the Agreement, they conceded these Restrictive Covenants were "reasonable and necessary to protect the legitimate interests of [Khiyani] **and**

**constitute a material inducement to [Khiyani]** to enter into this Agreement and consummate the transactions contemplated by this Agreement." *See* Agreement at § 4.3(c) (emphasis added).

31.     But for the Restrictive Covenants set forth in the Agreement, including their duration and geographic scope, Khiyani would not have entered into the Agreement.

32.     Finally, the Brysons expressly authorized Khiyani to obtain injunctive and other relief if they breached or threatened to breach the Restrictive Covenants.

33.     Specifically, the Brysons agreed that "a breach or threatened breach of this Section 4.3 [*i.e.*, the Restrictive Covenants] would give rise to irreparable harm to [Khiyani], for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach by [the Brysons] of any such obligations, [Khiyani] **shall**, in addition to any and all other rights and remedies that may be available to it in respect of such breach, **be entitled to equitable relief, including** a temporary restraining order, **an injunction**, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond)." *See* Agreement at § 4.3(b) (Emphasis added).

**C.     The Brysons Misrepresentations Concerning The Companies' Financials and Operations.**

34.     As stated above, pursuant to Article 3 of the Agreement, the Brysons made certain express representations and warranties to Khiyani concerning the Companies' financials and operations.

35.     Around the end of March 2023, the Brysons provided the Companies' financial statements with Khiyani, representing to Khiyani that the financial statements were "prepared in accordance with [the] Companies' past practices consistently applied based upon the information contained in the Companies' books and records and present fairly in all material respects the

financial condition and results of operations of the Companies as of the times and for the periods referred to therein…" *See* Agreement at § 3.5.

36.    In other words, the Brysons represented and warranted that the financial statements were accurate and reflected the financial state of the Companies that Khiyani was purchasing.

37.    In reliance on these representations and warranties contained in the Agreement, among other things, Khiyani proceeded with the purchase of the Companies at the agreed-upon purchase price and entered into the Agreement.

38.    Contrary to the Brysons' representations and warranties, the Brysons failed to disclose significant liabilities and inaccurately listed significant "profits," in violation of Section 3.7 of the Agreement.

39.    Further, the financial statements provided by the Brysons were materially inaccurate and misleading, as they failed to account for or disclose the withdrawal of funds from the Companies' bank accounts on the eve of closing.

40.    The inaccurate and misleading financial statements artificially inflated the EBITDA that was used to calculate the sales price.

41.    More specifically, on or about April 14, 2023, the Brysons withdrew ████ from Noble's bank account, ████ from Legacy's bank account, and ████ from Devoted's bank account, leaving a cash balance of zero in each bank account, and thereby materially overstating the Companies' cash position and overall financial health.

**D.    The Brysons' Representations Regarding Allied**

42.    During negotiations of the Agreement, the Brysons did not disclose the nuanced nature of the Companies' business model, including the full nature of the relationships with Medicaid licensees. For example, the Brysons represented that Heartsong, despite being named

an "Adult Day Care," was only a third-party Medicaid licensed billing provider. As such, the Brysons represented that the Companies' agreement with Heartsong was only for Medicaid billing purposes, and that the Companies could continue to use Heartsong as a Medicaid billing processor.

43.     Khiyani was also made aware that the Brysons had another business, Allied. However, in or around March 2023, during the due diligence process, the Brysons specifically represented that Allied operated identically to Heartsong, such that Allied was merely an alternative Medicaid licensed billing provider to process Medicaid claims for the Companies.

44.     The Brysons further assured Khiyani during the due diligence process that Allied was formed solely to provide the Companies with an additional option for Medicaid billing, and that Allied's interests were "aligned" with Khiyani's to grow the Companies' Medicaid business. The Brysons assured Khiyani that neither they nor Allied would work with any other In-Home Care Service providers. Furthermore, the Brysons also failed to disclose that Allied would be performing case management services.

45.     Indeed, on March 15, 2023 – while the parties were actively negotiating and less than a month before executing the Agreement – Stephen filed a certificate of assumed name for Allied with the Kentucky Secretary of State's Office, representing that Allied conducted business as Allied Billing Company. *See* Exhibit 3.

**E.     The Brysons Wrongfully Terminated the Companies' Contract with Heartsong**

46.     Upon Khiyani's purchase of the Companies in April of 2023, the Companies remained under contract with Heartsong.

47.    However, on or around late April 2023, Stephen – purporting to be the owner of the Companies and without Khiyani's permission – contacted Heartsong and terminated all contracts between the Companies and Heartsong.

48.    By terminating the contract with Heartsong, Stephen terminated the provision of subcontracted services to all of the Companies' Medicaid clients, causing significant damage and harm to the Companies.

49.    After wrongfully terminating the Companies' contracts with Heartsong, Stephen shifted the Companies' Medicaid business to Allied.

50.    Unbeknownst to Khiyani, Stephen had entered Devoted into a contract with Allied in September of 2022, which purported to obligate Devoted to serve only Allied's clients and bound Devoted (and any entity Devoted may have a beneficial interest in, *e.g.*, Legacy and Noble) to non-compete and non-solicitation covenants, and which precluded the Companies from providing In-Home Care Services to any other Medicaid provider, such as Heartsong.

51.    Stephen proceeded to inform Khiyani that Allied must be the Companies' sole Medicaid billing provider, and that the September 2022 contract's non-compete and non-solicitation covenants prevented the Companies from using any other Medicaid provider.

52.    Khiyani disputed these self-serving contracts and actions by the Brysons. After several months, the Parties eventually agreed to remove the non-compete and non-solicitation covenants from the September 2022 contract, which permitted the Companies to again do business with Heartsong. On November 22, 2023, the Companies executed the revised contract with Allied (the "Service Contract").

53.    Despite the terms of the Agreement, Stephen made clear of his plan that if the Companies did business with Heartsong, then Stephen would transfer Allied to his son, Dean

Bryson (who is currently the head of case management at Allied) or another buyer who the restrictive covenants would not bind, and/or he would otherwise use Allied to divert business from the Companies and invite or encourage more competitors of the Companies into the Western Kentucky Market. Unfortunately, this threat has come to fruition.

### F. Allied Is Continually Expanding its Business to Compete with the Companies and to Divert Business Away from the Companies

54. Contrary to the Brysons' representations during the due diligence process and the Restrictive Covenants in the Agreement, Allied is not solely a Medicaid billing provider for the benefit of the Companies.

55. Indeed, Allied began offering its Medicaid clients in the Companies' exclusive territory to have their In-Home Care Services provided by the Companies' direct competitors like Black Pearl Home Care LLC ("Black Pearl") and Home Sweet Home Care ("HSHC"). Indeed, Black Pearl Home and HSHC are subcontractors of Allied that provide In-Home Care Services for Allied in the Companies' exclusive territory.

56. Stephen's wrongful termination of the Heartsong agreement and operation of Allied allowed the Companies' competitors to grow in the Western Kentucky Market, reducing the Companies' competitive standing in the market.

57. In or around January 2024, Khiyani confronted Stephen about Allied's use of the Companies' competitors and diversion of business, and he demanded that Defendants abide by the Agreement and stop providing In-Home Care Services in the exclusive territory.

58. To Khiyani's knowledge, Stephen discontinued Allied's direct provision of In-Home Care Services within the Companies' exclusive territory. While Allied's direct violation of offering In-Home Care Services may have ceased, Defendants continue to violate the Agreement via numerous other methods.

25058297.v3

59.    For example, in January 2024, Khiyani learned that Allied was expanding its business to provide Medicaid case management services in addition to its existing Medicaid billing services.

60.    As part of this expansion, Allied began hiring several case managers that managed the Companies' Medicaid clients. Thus, these case managers became under Allied's direction and control.

61.    By providing case management services, Allied is controlling how and when business is obtained by and referred to the Companies, directly impacting and permitting Allied to divert business away from the Companies.

62.    Under the guise of "case management," Allied has begun referring Medicaid clients to the Companies' direct competitors like Black Pearl and HSHC.

63.    Specifically, Allied would target and hire case managers in the Western Kentucky Market, who were specifically managing Medicaid clients that receive In-Home Care Services from the Companies' caregivers. Allied has directed and/or permitted these case managers to make referrals for these Medicaid clients to the Companies' direct competitors.

64.    Thus, the provision of case management services, as well as these referrals by Allied, violates section 4.3(a) of the Agreement and the Service Contract.

65.    Beginning around November of 2024, the Brysons once again expanded Allied's business within the Western Kentucky Market to further divert business away from the Companies by:

      i.    Providing case management services to enroll clients through Kentucky's Participant-Directed Services ("PDS") program, which effectively serves to circumvent the Companies as it connects clients directly with individual caregivers;

ii.    Using the guise of case management services to direct, assist or otherwise influence clients to connect with competitors to the Companies for identical In-Home Care Services;

iii.    Using former client lists, caregiver rosters, pricing models, and care plans obtained by the Brysons during their ownership of the Companies; and

iv.    Soliciting and diverting the Companies' caregivers and clients away from the Companies by promising higher wages through the PDS program.

66.    Specifically, Defendants have contacted numerous active clients of the Companies, through their role as the clients' case manager, and "consulted," *i.e.*, persuaded and influenced them to transfer their In-Home Care Services to other competing in-home care entities, including Black Pearl and HSHC, or facilitated for caregivers to work directly with the client through the PDS program. In doing so, Defendants are cutting the Companies' out of the equation, diverting business away from the Companies.

67.    Further, Defendants have also diverted or attempted to divert caregivers away from the Companies.

68.    They have also taken advantage of the Companies' confidential caregiver schedules, wage information, and client care plans in order to solicit clients and caregivers away from the Companies. Indeed, Defendants – knowing the wage the Companies' caregivers – have informed these caregivers that they can make more money under the PDS program instead of with the Companies.

69.    Moreover, Allied publicly advertises services that mirror the Companies' Restricted Business (*i.e.*, In-Home Care Services) within the Western Kentucky Market, including "personal care (bathing, dressing, grooming, oral hygiene), mobility, transferring and positioning assistance, toileting, incontinence care …, light housekeeping, meal preparation or home delivered meal program, assistance with feeding, medication reminders, assistance with errands (transportation, church services, doctors' appointments, hair appointments, grocery, etc.),

companionship and socialization, case management – monthly contacts, development of patient centered plans of care," as well as Alzheimer's and dementia support. *See* Allied's website, publicly available at https://alliedadult.com/index.php/about-us/ (last accessed September 25, 2025).

70. These acts were intentional, knowing, and in direct violation of Sections 4.2 and 4.3 of the Agreement.

71. Defendants' violations of the Agreement are causing a significant decrease in Companies' Medicaid services.

72. Specifically, for example, in June 2024, the Companies' Devoted location serviced approximately ▮ Medicaid clients, generating approximately ▮ in revenue. However, in June 2025, Devoted serviced ▮ Medicaid clients, with only ▮ in revenue, representing an over 23% decrease in customers and a more than 10% decrease in Medicaid revenue.

73. By way of another example, in July 2024, the Companies' Devoted location serviced approximately ▮ Medicaid clients, generating approximately ▮ in revenue. However, in July 2025, Devoted serviced ▮ Medicaid clients, with only ▮ in revenue, representing an over 30% decrease in customers and a more than 21% decrease in Medicaid revenue.

74. Further, the Companies' loss of Medicaid business is significant and rapidly accelerating. In just the week of August 10, 2025 through August 16, 2025, Devoted generated approximately ▮ in revenue for ▮ Medicaid clients. The same week last year, Devoted generated approximately ▮ in revenue for ▮ Medicaid clients, representing an over 33% decrease in Medicaid clients and a 25% decrease in Medicaid revenue.

75.    The damage is not just limited to Devoted: in May 2023, Noble's revenue was approximately ▮▮▮▮▮ In comparison, Noble's revenue in August 2025 was only approximately ▮▮▮▮.

76.    Further, as a direct result of Defendant's conduct, Black Pearl and HSHC have also rapidly developed a strong presence in the Western Kentucky Market to directly compete with the Companies.

**G.    The Brysons and Allied Refuse to Stop Stealing Business from the Companies**

77.    On June 18, 2025, Home Instead sent Stephen a cease-and-desist letter demanding that Defendants stop (a) all Restricted Business, (b) providing or coordinating In-Home Care Services, (c) diverting or attempting to divert any existing or potential client or caregiver away from the Companies; and (d) owning, maintaining, operating, or holding any financial or beneficial interest in any business that provides services within the scope of the In-Home Care Services.

78.    Due to the Defendants' failure to respond promptly, on June 29, 2025, counsel for Khiyani sent Defendants another cease-and-desist letter, echoing the same violations and making similar demands by referencing the Agreement and the Restrictive Covenants.

79.    To date, Defendants have refused to cease and desist from violating the Agreement and tortiously interfering with the Companies' business relations.

80.    Defendants' misconduct has caused Khiyani immediate and irreparable harm, including loss of goodwill of the Companies, loss of Medicaid clients, loss of trained caregivers, depletion of proprietary information, loss of competitive standing, and diminution in franchise value. Further, the Companies must maintain certain performance metrics for the Companies to

retain their franchise with Home Instead. Thus, Defendants' actions are also jeopardizing Khiyani's franchise relationship.

81.     Unless and until this Court grants equitable relief in the form of a preliminary and permanent injunction prohibiting Defendants from violating the Agreement, Khiyani will suffer immediate and severe irreparable harm for which it has no legal remedy. Thus, Khiyani respectfully demands relief in the form of a preliminary and permanent injunction pending a full adjudication of the dispute between the parties.

## IV.     CAUSES OF ACTION

### COUNT I:  INJUNCTIVE RELIEF

82.     Khiyani restates and incorporates herein by reference the allegations above.

83.     Based upon the foregoing facts, Khiyani has demonstrated a high likelihood of success on the merits of its claims set forth herein that the Brysons violated the Restrictive Covenants set forth in sections 4.2 and 4.3 of the Agreement.

84.     Further, a balance of the equities favors issuing an injunction against the Defendants because they have simply decided to ignore their binding obligations to Khiyani under the Agreement.

85.     The issuance of injunctive relief will serve the public interest in protecting the enforcement of reasonable contracts and the enforcement of Kentucky statutory law and public policy.

86.     The Brysons' unlawful conduct will cause Khiyani to suffer immediate and irreparable injury, as expressly acknowledged in the Agreement. Specifically, Khiyani has lost and will continue to lose clients and caregivers, certain competitive advantages, and sustain injury to the goodwill and reputation in the Companies. As the Brysons acknowledged in the Agreement, Khiyani will continue suffering such irreparable injury unless the Court immediately

enjoins the Brysons from such unlawful activities (whether conducted directly or indirectly). Khiyani has no adequate remedy at law or other means to address this injury, other than the Court immediately enjoining the Brysons from such unlawful activities.

87.	For the reasons set forth above, the Court should restrain and enjoin the Brysons in the manner described in the Prayer for Relief below.

## COUNT II:  BREACH OF CONTRACT

88.	Khiyani restates and incorporates herein by reference the allegations above.

89.	The Agreement is a valid, enforceable contract between Khiyani and the Brysons.

90.	By engaging in the conduct described above and refusing to abide by the terms of the Agreement as set forth herein, the Brysons violated Sections 3.5, 3.7, 3.8, 4.2, and 4.3 of the Agreement and are actually and proximately causing harm and damage to Khiyani.

91.	As a direct and proximate result of Defendants' breaches related to representations and warranties, Khiyani has suffered and will continue to suffer damages, including but not limited to the overpayment for the Companies, assumption of undisclosed liabilities, and other consequential losses, in an amount to be determined at trial.

92.	Furthermore, if the Court does not enjoin the Brysons from violating Sections 4.2 and 4.3 of the Agreement (either directly or indirectly through Allied), it will cause irreparable injury to Khiyani that cannot be fully recompensed by money damages.

93.	Accordingly, Khiyani has suffered and will continue to suffer irreparable harm and loss due to Defendants' breaches of the Agreement, and is entitled to injunctive relief and any and all other damages available, including lost income, lost client and caregiver relationships and future lost client and caregiver relationships, lost or diminished competitive advantages, and injury to the goodwill and reputation of the Companies, loss of franchise value, and

disgorgement, as well as any other direct, consequential, and incidental damages in an amount in excess of the jurisdictional threshold of this Court to be proven at trial.

94.     Accordingly, Khiyani is entitled to relief, including, but not limited to, the injunctive relief, damages, disgorgement remedies, and attorneys' fees as described herein and in the Prayer for Relief below.

**COUNT III:  BREACH OF COVENANT
OF GOOD FAITH AND FAIR DEALING**

95.     Khiyani restates and incorporates herein by reference the allegations above.

96.     Under Kentucky law, every contract imposes an implied covenant of good faith in its performance and enforcement. This covenant imposes a duty upon the parties to do everything necessary to carry out the contract.

97.     The Agreement imposed this implied duty of good faith and fair dealing toward Khiyani by the Brysons.

98.     The Brysons knew and understood that Khiyani would rely on the Agreement and its assurances in negotiating and entering into it.

99.     By engaging in the conduct described above, the Brysons breached the Agreement's covenant of good faith and fair dealing. The Brysons, both directly and through Allied, have acted without good faith and engaged in conduct that denied Khiyani the benefit of the bargain originally intended in the Agreement.

100.    Because of the Brysons' actions described above, Khiyani has suffered and will continue to suffer irreparable harm and loss, and is entitled to injunctive relief and any and all other damages, including, but not limited to, lost income, lost client and caregiver relationships and future lost client and caregiver relationships, lost or diminished competitive advantages, and injury to the goodwill and reputation of the Companies, loss of franchise value, and

25058297.v3

disgorgement, as well as any other direct, consequential, and incidental damages in an amount in excess of the jurisdictional threshold of this Court to be proven at trial.

101.    Accordingly, Khiyani is entitled to relief, including, but not limited to, the injunctive relief, damages, and disgorgement remedies described herein and in the Prayer for Relief below.

## COUNT IV:  TORTIOUS INTERFERENCE WITH CONTRACT BY ALLIED

102.    Khiyani restates and incorporates herein by reference the allegations above.

103.    Allied had no lawful privilege or excuse for engaging in the unlawful conduct described above.

104.    By engaging in such conduct, Allied had actual knowledge of the Agreement and intentionally interfered with the Agreement.

105.    Allied's interference with the Agreement is precluding Khiyani from fully enjoying his bargained-for benefits contained in the Agreement.

106.    Without immediate injunctive relief, Allied is likely to continue engaging in such unlawful conduct and tortious interference with the Agreement.

107.    Because of Allied's actions and tortious interference described above, Khiyani has suffered and will continue to suffer irreparable harm and loss, and is entitled to injunctive relief and any and all other damages, including, but not limited to, lost income, lost client and caregiver relationships and future lost client and caregiver relationships, lost or diminished competitive advantages, and injury to the goodwill and reputation of the Companies, loss of franchise value, and disgorgement, as well as any other direct, consequential, and incidental damages in an amount in excess of the jurisdictional threshold of this Court to be proven at trial.

108. Accordingly, Khiyani is entitled to relief, including, but not limited to, the injunctive relief, damages, and disgorgement remedies described herein and in the Prayer for Relief below.

## COUNT V:  TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND PROSPECTIVE BUSINESS RELATIONS BY DEFENDANTS

109. Khiyani restates and incorporates herein by reference the allegations above.

110. The Companies cultivated, developed, and maintained a number of business relationships with prospective and existing clients and caregivers.

111. Each of these relationships represents an actual business relationship and was substantially probable to develop into a pecuniary advantage for the Companies.

112. As set forth above, the Defendants had actual knowledge of the Companies' business relationships and have intentionally interfered with both the existing business relations and prospective business advantages.

113. But for any such interference, Khiyani would fully enjoy the bargained-for benefits of these business relationships and prospective business advantages.

114. Without immediate injunctive relief, Defendants are likely to continue engaging in such unlawful conduct and tortious interference.

115. Because of the Defendants' actions and tortious interference described above, Khiyani has suffered and will continue to suffer irreparable harm and loss, and is entitled to injunctive relief and any and all other damages, including, but not limited to, lost income, lost client and caregiver relationships and future lost client and caregiver relationships, lost or diminished competitive advantages, and injury to the goodwill and reputation of the Companies, loss of franchise value, and disgorgement, as well as any other direct, consequential, and

incidental damages in an amount in excess of the jurisdictional threshold of this Court to be proven at trial.

116.     Accordingly, Khiyani is entitled to relief, including, but not limited to, the injunctive relief, damages, and disgorgement remedies described herein and in the Prayer for Relief below.

## COUNT VI:  VIOLATION OF THE KENTUCKY UNIFORM TRADE SECRETS ACT BY DEFENDANTS

117.     Khiyani restates and incorporates herein by reference the allegations above.

118.     The Companies' confidential information constitutes trade secrets as defined by the Kentucky Uniform Trade Secrets Act, KRS 365.880 *et seq.*

119.     By virtue of its relationship with the Companies, Defendants gained access to and knowledge of the Companies' trade secrets and had a contractual duty to maintain the secrecy of and limit the use of those trade secrets.

120.     By engaging in the conduct described above, the Defendants willfully and maliciously misappropriated the Companies' trade secrets for their own use and profit in violation of their contractual duties, and violated the Uniform Trade Secrets Act, KRS 365.880 *et seq.*

121.     Defendants are likely to continue engaging in such unlawful conduct.

122.     Because of the Defendants' unlawful conduct in violation of the Uniform Trade Secrets Act, Khiyani has suffered and will continue to suffer irreparable harm and loss, and is entitled to injunctive relief and any and all other damages, including, but not limited to, lost income, lost client and caregiver relationships and future lost client and caregiver relationships, lost or diminished competitive advantages, and injury to the goodwill and reputation of the Companies, loss of franchise value, and disgorgement, as well as any other direct, consequential,

and incidental damages in an amount in excess of the jurisdictional threshold of this Court to be proven at trial.

123.    Accordingly, Khiyani is entitled to relief, including, but not limited to, the injunctive relief, damages, and disgorgement remedies described herein and in the Prayer for Relief below.

124.    Additionally, because Defendants' misappropriation is willful and malicious, Khiyani is entitled to exemplary treble damages and an award of reasonable attorneys' fees pursuant to the Kentucky Uniform Trade Secrets Act, KRS 365.880 *et seq.*

**COUNT VII: CONSPIRACY TO COMMIT**
**UNLAWFUL CONDUCT BY DEFENDANTS**

125.    Khiyani restates and incorporates herein by reference the allegations above.

126.    By engaging in the conduct described above, Defendants agreed to and undertook unlawful acts in concert in order to: misappropriate the Companies' trade secrets; disclose and use confidential and proprietary trade secrets of the Companies; tortiously interfere with Khiyani's business relations and prospective business relations; tortiously interfere with Khiyani's Agreement with the Brysons; violate the Kentucky Uniform Trade Secrets Act; and compete unfairly.

127.    Because of the Defendants' unlawful conspiracy, Khiyani has suffered and will continue to suffer irreparable harm and loss, and is entitled to injunctive relief and any and all other damages, including, but not limited to, lost income, lost client and caregiver relationships and future lost client and caregiver relationships, lost or diminished competitive advantages, and injury to the goodwill and reputation of the Companies, loss of franchise value, and disgorgement, as well as any other direct, consequential, and incidental damages in an amount in excess of the jurisdictional threshold of this Court to be proven at trial.

128.    Accordingly, Khiyani is entitled to relief, including, but not limited to, the injunctive relief, damages, and disgorgement remedies described herein and in the Prayer for Relief below.

## COUNT VIII: UNJUST ENRICHMENT/ QUANTUM MERUIT/RESTITUTION

129.    Khiyani restates and incorporates herein by reference the allegations above.

130.    Defendants misappropriated Khiyani's clients, caregivers, contracts, and business relationships through the acts and omissions set forth above.

131.    To date, Khiyani has not received sufficient compensation or consideration from Defendants for the property and business interests which they wrongfully took from Khiyani for their own benefit.

132.    Khiyani suffered damages as a result of the improper acts described above, and is therefore entitled to compensation from Defendants in the amount equal to which Defendants have been unjustly enriched.

## COUNT IX: FRAUD/NEGLIGENT MISREPRESENTATION/DECEIT/FAILURE TO DISCLOSE

133.    Khiyani restates and incorporates herein by reference the allegations above.

134.    Defendants had a duty not to intentionally, willfully, maliciously, negligently, and wrongfully harm Khiyani and his business interests, in the manner set forth above.

135.    Defendants acted with oppression, fraud, and malice towards Khiyani by acting in their own self-interest and intentionally and willfully or negligently misrepresenting, and/or failing to disclose, certain facts and circumstances which they had a duty to disclose to Khiyani, the Companies, and/or the Commonwealth of Kentucky as stated above.

136.    At all times relevant, Stephen falsely and fraudulently represented that he was acting in good faith and in the best interests of Khiyani and the Companies during and after negotiations of the Agreement, both under the terms of the Agreement and in his role as a consultant, in furtherance of Defendants' wrongful scheme.

137.    Defendants made material representations to Khiyani regarding the financial condition of the Companies, including the accuracy of the financial statements, representations regarding profits, the absence of undisclosed liabilities, and compliance with legal requirements.

138.    Defendants knew, or should have known, that these representations were false and misleading, as Defendants had caused or permitted the withdrawal of all the funds from each of the Companies' bank accounts immediately prior to closing that were intended to be reserved for the Companies, leaving the Companies out of compliance with legal requirements and artificially inflated the EBITDA that was used to calculate the sales price.

139.    Defendants made these representations with the intent to induce Khiyani to enter into the Agreement at a sales price well-above the Companies' market value, or, in the alternative, Defendants made such representations negligently, without reasonable grounds for believing them to be true.

140.    As explained above, Defendants also represented that Allied operated as a Medicaid licensed billing provider to process Medicaid claims for the Companies. The Brysons assured Khiyani that Allied was formed solely to provide the Companies with an additional option for Medicaid billing, and that Allied's interests were "aligned" with Khiyani's to grow the Companies' Medicaid business. The Brysons assured Khiyani that neither they nor Allied would work with any other In-Home Care Service providers. Furthermore, the Brysons also failed to

disclose that Allied would be performing case management services and referring Medicaid clients to the Companies' direct competitors like Black Pearl and HSHC.

141.    Defendants made these representations regarding Allied with the intent to induce Khiyani to enter into the Agreement, or, in the alternative, Defendants made such representations negligently, without reasonable grounds for believing them to be true.

142.    Khiyani detrimentally relied on Defendants' misrepresentations in proceeding with the Agreement, and the absence of information that Defendants had a duty to disclose during and after negotiations of the Agreement.

143.    As a direct and proximate result of Defendants' fraudulent and/or negligent misrepresentations, Khiyani has suffered damages, including but not limited to the overpayment for the Companies, assumption of undisclosed liabilities, lost income, lost client and caregiver relationships and future lost client and caregiver relationships, lost or diminished competitive advantages, and injury to the goodwill and reputation of the Companies, loss of franchise value, and disgorgement, as well as any other direct, consequential, and incidental damages in an amount in excess of the jurisdictional threshold of this Court to be proven at trial and other consequential losses, in an amount to be determined at trial, including punitive damages.

## V. **PRAYER FOR RELIEF**

Due to Defendants' unlawful conduct described above, Khiyani requests the following relief:

(1)    Judgment in Khiyani's favor on the above Causes of Action;

(2)    A Restraining Order, Temporary Injunction, and ultimately a Permanent Injunction, as described in more detail in the Motion for Temporary Restraining Order and Preliminary Injunction, and Memorandum in Support thereof;

(3)    Damages that include, but are not limited to: (i) compensatory damages to remedy the actual loss Khiyani sustained as an actual or proximate result of any or all of the Defendants' conduct described above; (ii) compensatory damages to reflect

the unjust enrichment any or all of the Defendants received; (iii) disgorgement and/or rescission of all amounts improperly diverted, received, retained, or otherwise misappropriated by Defendants; (iv) punitive and exemplary damages, including treble damages for theft of trade secrets; (v) costs; (vi) attorney's fees; (vii) pre-judgment and post-judgment interest on any available damages at the maximum rate allowed by law; and (viii) any other applicable fees or expenses; and

(4)    Any other relief to which Khiyani may be entitled.

Respectfully submitted,

*/s/ A. Lauren R. Nichols*
Benjamin J. Lewis
A. Lauren R. Nichols
Lincoln J. Carr
DENTONS BINGHAM GREENEBAUM LLP
3500 PNC Tower
101 South Fifth Street
Louisville, Kentucky  40202
Phone: (502) 589-4200
Email: ben.lewis@dentons.com
Email: lauren.nichols@dentons.com
Email: lincoln.carr@dentons.com

COUNSEL FOR PLAINTIFF,
KUNAL KHIYANI

## **VERIFICATION**

I, Kunal Khiyani, declare under penalty of perjury, that I have read the foregoing Verified Complaint and verify that the facts stated in it are true and correct to the best of my knowledge, information and belief.

Executed on 26 of September, 2025.

_____
Kunal Khiyani

STATE OF FLORIDA          )
                          ) SS:
COUNTY OF MIAMI-DADE      )

Before me, the undersigned, a Notary Public in and for said County and State, personally appeared Kunal Khiyani, and acknowledged the execution of the foregoing.

WITNESS my hand and Notarial Seal, this _____26_____ day of September, 2025.

_____
Notary Public

My Commission Expires:

RUBEN J. DOMINGUEZ
Commission # HH 349430
Expires March 8, 2027