UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:25-CV-00114-GNS

KUNAL KHIYANI                                                                                           PLAINTIFF

v.

ALLIED ADULT DAY CARE, LLC,
d/b/a ALLIED BILLING COMPANY et al.                                                       DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motions for Leave to Seal (DN 6, 9, 23), Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (DN 8), and Defendants' Motion to File Belated Brief (DN 27). The motions are ripe for adjudication.

**I.      BACKGROUND**

In April 2023, Plaintiff Kunal Khiyani ("Khiyani") entered into an equity purchase agreement ("Purchase Agreement") with Defendants Stephen and Kimberly Bryson (collectively, "the Brysons") for the purchase of the Brysons' membership interests in three Kentucky limited liability companies—Devoted Senior Care, LLC, Legacy Senior Care, LLC, and Noble Senior Care, LLC (collectively, "the Companies"). (Am. Compl. Ex. 1, at 1, DN 15-1). The Companies are each franchisees of Home Instead, Inc. (Am. Compl. Ex. 1, at 1).

The Companies provide in-home care and personal assistance services, roughly half of which are paid for by Medicaid. (TRO & Prelim. Inj. Hr'g, Oct. 30, 2025, 10:28-29 AM). Medicaid requires clients to work with a case manager, who will refer them to a Medicaid licensee providing care services. (TRO & Prelim. Inj. Hr'g at 2:40 PM). The Companies are subcontractors for these licensees. (TRO & Prelim. Inj. Hr'g at 10:28-29 AM). Medicaid requires a client's case

1

manager to be distinct from the care provider as an oversight mechanism. 907 KAR 7:010; 42 C.F.R. § 441.301(c)(1)(vi); (TRO & Prelim. Inj. Hr'g at 2:41 PM). The Brysons provide case management services through Defendant Allied Adult Day Care, LLC, ("Allied") in western Kentucky. (TRO & Prelim. Inj. Hr'g at 2:40-41 PM). Allied provides attendant care services in other parts of the state. (TRO & Prelim. Inj. Hr'g at 2:40-41 PM).

The Purchase Agreement prohibits the Brysons from using the Companies' confidential information. (Am. Compl. Ex. 1, at 16). The Purchase Agreement also includes a noncompetition provision, preventing the Brysons from:

(i) directly or indirectly, alone or as a partner, equityholder, owner, joint venturer, officer, director, manager, member, employee, consultant, agent, or independent contractor of, or lender to, any Person (other than any of the Affiliated Entities (as defined below)), engage in any Restricted Business (as defined below) anywhere within the exclusive area described in the Franchise Agreements (provided that the passive ownership of less than 5% of the ownership interests of an entity having a class of securities that is traded on a national securities exchange or over-the-counter market is not a violation of this paragraph);

(ii) directly or indirectly, alone or as a partner, equityholder, owner, joint venturer, officer, director, manager, member, employee, consultant, agent, or independent contractor of, or lender to, any Person, request or advise any customer or any other Person, firm, vendor, contractor, lessor, franchisee, or other entity having a business relationship (whether formed prior to or after the date of this Agreement) with Buyer or any of his Affiliates (including the Companies) (Buyer and his Affiliates, including the Companies, each an "Affiliated Entity" and collectively the "Affiliated Entities"), to withdraw, curtail, or cancel any of its Restricted Business (as defined below) with such Affiliated Entity or engage in any other activity that could reasonably be expected to have an adverse effect on the business relationship such Person has with such Affiliated Entity;

(iii) directly or indirectly, alone or as a partner, equityholder, owner, joint venturer, officer, director, manager, member, employee, consultant, agent, or independent contractor of, or lender to, any Person, solicit or divert Restricted Business (as defined below) from, or attempt to convert to other methods of using the same or similar products or services as provided by an Affiliated Entity, any customer, client, account or location of an Affiliated Entity; or

(iv) directly or indirectly, alone or as a partner, equityholder, owner, joint venturer, officer, director, manager, member, employee, consultant, agent,

> or independent contractor of, or lender to, any Person, solicit for employment, or engagement as an independent contractor, or for any other similar purpose, any Person who was in the twelve-month period preceding the solicitation or is at the time of the solicitation, an employee of any Affiliated Entity, except with respect to Madison Fariss.

(Am. Compl. Ex. 1, at 16-17 (original emphasis omitted)). Restricted business is defined as "providing various in-home nonmedical care and personal assistance services, including care and companionship services, bathing, dressing, grooming, personal hygiene assistance, light housekeeping, meal planning and preparation, running errands, transportation, medication reminders, and Alzheimer's and dementia care." (Am. Compl. Ex. 1, at 17).

Khiyani alleges that the Brysons misrepresented Allied as providing only Medicaid billing services and failed to disclose Allied's performance of case management services. (Pl.'s Mem. Supp. Mot. TRO Prelim. & Inj. 10, DN 8-1). According to Khiyani, by referring Medicare patients to the Companies' direct competitors and enrolling patients in Kentucky's Participant-Directed Services ("PDS") program connecting patients to individual caregivers, Allied diverts business away from the Companies in violation of the noncompetition agreement. (Pl.'s Mem. Supp. Mot. TRO & Prelim. Inj. 12). Khiyani also asserts that the Brysons are using the Companies' confidential information—including former client lists, caregiver schedules, and wage information—to provide case management services and hire caregivers for PDS. (Pl.'s Mem. Supp. Mot. TRO & Prelim. Inj. 13).

Khiyani initiated this suit and moved for a preliminary injunction. (Compl., DN 1; Pl.'s Mot. TRO & Prelim. Inj., DN 8). An evidentiary hearing was held on October 30, 2025. (Text Order, DN 19). Allied moved for leave to file a belated brief. (Defs.' Mot. Leave File Belated Br., DN 27).

## II.  JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

## III.  DISCUSSION

### A.  Defendants' Motion for Leave to File Belated Brief

Allied moved for leave to file a belated brief.  (Defs.' Mot. Leave File Belated Br. 1).  At the October 30 evidentiary hearing, the parties were ordered to submit supplemental briefs.  (Text Order, DN 19).  While Defendants' supplemental brief was due by November 13, 2025, they did not file their supplemental brief until November 14, 2025.  (Defs.' Supp. Br., DN 26).  In the interest of having the arguments fully presented for the Court's consideration, Defendants' brief will be considered.  Accordingly, Allied's motion is granted.

### B.  Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

Evaluating a request for the "extraordinary remedy" of a temporary restraining order or preliminary injunction requires considering and balancing four factors:  (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008) (citations omitted); *Adams v. Fed. Express Corp.*, 547 F.2d 319, 323 (6th Cir. 1976) (citing *N. Avondale Neighborhood Ass'n v. Cincinnati Metro. Hous. Auth.*, 464 F.2d 486, 488 (6th Cir. 1972)); *see also* Fed. R. Civ. P. 65.  A court should make specific findings concerning each factor, "unless fewer are dispositive of the issue."  *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985) (citing *United States v. Sch. Dist. of Ferndale*, 577 F.2d 1339, 1352 (6th Cir. 1978)).

The four preliminary injunction factors are "factors to be balanced, not prerequisites that must be met . . . ." *Michael v. Futhey*, No. 08-3932, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009) (internal quotation marks omitted) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir. 1997)). Nonetheless, the hallmark of injunctive relief is a likelihood of irreparable harm. *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("[T]he demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction." (citation omitted)); *see also Winter*, 555 U.S. at 7, 22-23 (rejecting the notion that a mere "possibility" of irreparable injury was sufficient for a preliminary injunction and holding that "plaintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is likely in the absence of an injunction") (emphasis in original). Additionally, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (citation omitted).

Plaintiff bears the burden of demonstrating his entitlement to a preliminary injunction, and his burden is a heavy one. "Certainly, 'scant evidence' will not support an injunction." *A.M.C. v. Smith*, 620 F. Supp. 3d 713, 731-32 (M.D. Tenn. 2022) (quoting *Patel v. AR Grp. Tenn., LLC*, No. 3:20-CV-00052, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020)). Injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th. Cir. 2002) (citation omitted); *see also Winter*, 555 U.S. at 24.

1. ***Irreparable Injury***

"To establish immediate and irreparable harm there must be an actual, viable, presently existing threat of serious harm." *C.A. Jones Mgmt. Grp., LLC v. Scottsdale Indem. Co.*, No. 5:13-CV-00173, 2014 WL 811654, at *4 (W.D. Ky. Feb. 28, 2014) (citation omitted). The threat must

5

be more concrete than "speculative or protentional harm." *Moms for Liberty - Wilson Cnty., Tenn. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 514 (6th Cir. 2025).

As the Sixth Circuit has noted, "a plaintiff's harm is not irreparable if it is fully compensable by money damages. However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Id.* at 512 (citing *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)). As Kentucky's highest court has stated, however, "evidence of prior profits in the same business generally provides a reasonable basis for the computation of future profits." *E. Ky. Lumber & Dev. Co. v. Waddell*, 239 S.W.2d 68, 71 (Ky. 1951) (citations omitted).

Khiyani alleges that the Companies will continue to lose revenue, goodwill, reputation, and competitive edge if an injunction is not granted. (Pl.'s Supp. Br. 9-10, DN 22). Although Khiyani's evidence of harm centers on damages from lost revenue and clients—which he has quantified—any harm to the Companies' goodwill, reputation, and competitive edge would be difficult to calculate. (Pl.'s Supp. Br. 7, 9).

Next, "an unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013) (citing *Aero Fulfillment Servs., Inc. v. Tartar*, No. C–060071, 2007 WL 120695, at *5 (Ohio Ct. App. 2007)). "In fact, numerous courts have recognized that any presumption of irreparable injury resulting from a court's finding that the plaintiff can show a substantial likelihood of success on the merits is rebutted by a delay of even a few months in

6

seeking preliminary injunctive relief." *Vita-Mix Corp. v. Tristar Prods., Inc.*, No. 1:07 CV 275, 2008 WL 11383504, at *9 (N.D. Ohio Sept. 30, 2008) (citation omitted); *see also id.* ("Therefore, even if Plaintiff could show a substantial likelihood of success on these claims and a presumption of irreparable harm arises, the court concludes that Plaintiff's eleven-month delay in seeking the extraordinary remedy of injunctive relief undermines its belated assertion of irreparable harm on these claims." (citation omitted)).

The Purchase Agreement was executed in 2023, and a string of disagreements soon followed. (Am. Compl. Ex. 1, at 1). The controversy relevant to this action—Allied's offering of case management services and hiring of case managers—began in early 2025. Around February, Khiyani learned that Allied was hiring case managers, and he asked Heartsong, the Companies' contractor, to begin tracking its referrals. (TRO & Prelim. Inj. Hr'g at 12:46 PM, 12:48 PM). Khiyani, however, did not file suit until October 2 and did not request injunctive relief until October 10. (Compl. 1, Pl.'s Mot. TRO & Prelim. Inj. 1). Therefore, it was around eight months passed before Khiyani moved for injunctive relief. This delay cannot be entirely attributed to attempts to settle the dispute out of court; sometime around February, Khiyani requested that the Brysons stop violating the noncompetition provision of the Purchase Agreement, but the Brysons did not reply to his emails. (TRO & Prelim. Inj. Hr'g at 12:48 PM); *see Lincoln Elec. Co. v. Harbor Freight Tools USA, Inc.*, No. 1:17-CV-2329, 2018 WL 10809987, at *15 (N.D. Ohio Aug. 15, 2018). Khiyani responds that he needed time to collect data and consult with his attorneys, but, nevertheless, his months-long delay speaks to the non-emergent nature of the alleged threat the Brysons posed to his business. (TRO & Prelim. Inj. Hr'g at 12:48 PM).

Although the terms of the Purchase Agreement provide that any violation would constitute irreparable harm, that stipulation is but "one piece" of evidence to consider. (Am. Compl. Ex. 1,

7

at 17); *CNG Fin. Corp. v. Brichler*, No. 1:21-CV-460, 2021 WL 4189577, at *13 (S.D. Ohio Sept. 14, 2021). "[T]he Court must also discount the weight of this stipulated 'irreparable harm' based on its blunt, foretelling posture. By stating that 'any' future breach of the material terms of the Non-Compete 'will' cause irreparable harm, the document manifests a certainty that would not be available to the parties who signed it." *CNG Fin. Corp*, 2021 WL 4189577, at *13.

Though the parties stipulated to irreparable harm and there may indeed be difficulty in calculating some damages, Khiyani's months-long delay is telling. Taken altogether, this factor weighs slightly against Khiyani.

### 2. *Likelihood of Success*

To establish a likelihood of success on the merits, "a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II*, 119 F.3d at 402 (citation omitted). A plaintiff must "establish[] a substantial likelihood or probability of success on the merits." *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 635 (6th Cir. 2010) (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000)).

Khiyani alleges that the Brysons are violating the noncompetition and confidentiality provisions of the Purchase Agreement.[1] (Pl.'s Mem. Supp. Mot. TRO Prelim. Inj. 12-13). It is

---

[1] Defendants assert that Khiyani states only derivative claims for the injuries to the Companies. (Defs.' Resp. Mot. TRO & Prelim. Inj. 7). Kentucky courts have held that "[a] shareholder's rights are merely derivative unless he can show violation of a duty owed directly to him." *Smith v. Tarter*, 305 F. Supp. 3d 733, 739 (E.D. Ky. 2018) (citing *Sahni v. Hock*, 369 S.W.3d 39, 47 (Ky. App. 2010)). "LLC members, like corporate shareholders, lack standing to sue in their individual capacities when they have not suffered any injury that is separate and distinct from the injury to the LLC or its other members." *Id.* at 740 (citing *Pixler v. Huff*, 3:11-CV-207, 2012 WL 3109492 (W.D. Ky. July 31, 2012). Khiyani, however, is not bringing derivative claims against the Defendants. The Brysons owe a contractual duty directly to Khiyani because he was a party to the Purchase Agreement. (Am. Compl. Ex. 1, at 1). Violations of the noncompetition and confidentiality provisions are violations of duties owed directly to him. Thus, Khiyani has standing to bring direct claims based on those violations.

8

certainly possible that Khiyani will be able to prove those allegations at trial; at this stage, however, Khiyani has not demonstrated a strong likelihood of success.

This is not a straightforward case where a company's former executive, who has signed a noncompetition agreement, begins working for that company's direct competitor. *See, e.g.*, *Quest Car Care Prods., Inc. v. Titus*, 708 F. Supp. 3d 1338, 1341 (W.D. Mich. 2023). Allied insists that it does not compete with the Companies and states that it provides case management services which are distinct from the provision of attendant care. No evidence has been produced that Allied case managers have requested or advised clients to leave the Companies. To the contrary, Allied employees testified that they have not advised any clients to avoid the Companies and are **prohibited** from giving advice or recommendations to clients about what care providers to choose. (*E.g.*, TRO & Prelim. Inj. Hr'g at 1:43-45 PM). Khiyani argues that any case management violates the noncompetition agreement—that Allied case managers "divert" business away from the Companies to other traditional providers and to PDS programs, and that this is an "activity that could reasonably be expected to have an adverse effect" on clients' relationships with the Companies. Although Khiyani may ultimately be correct, he has not established a substantial likelihood of such effect based on the evidence presently before the Court.

The only evidence Khiyani offered to show that Allied is misusing the Companies' confidential information is the Companies' list of case managers that was emailed to Allied employee Melinda Hoover in April 2023. (Pl.'s Ex. 22, TRO & Prelim. Inj. Hr'g). Hoover testified that she did not use that list to hire case managers for Allied, but to notify all case managers that the Companies would be operating under Allied. (TRO & Prelim. Inj. Hr'g at 2:29-30 PM). She also testified that the only Allied employees on that list are herself and her sister Joy Wilson. (TRO & Prelim. Inj. Hr'g at 2:30-31 PM). This evidence does not establish a strong

probability that Allied is improperly using the Companies' confidential information. *See McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) ("The court found this small showing did not lead to the conclusion that [the plaintiff] has a strong likelihood of success on the merits."). Because Khiyani has not met his burden of showing a substantial likelihood of success on the merits, this factor does not support the granting of an injunction.

### 3. *Substantial Harm*

"In considering this factor, the Court must (1) balance the harm Plaintiff would suffer if its request for a preliminary injunction were denied against the harm Defendant would suffer if an injunction were to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties." *Procter & Gamble Co. v. Ga.-Pac. Consumer Prods. LP*, No. 1:09-cv-318, 2009 WL 2407764, at *10 (S.D. Ohio Aug. 3, 2009) (citation omitted).

If an injunction were issued in this instance, there would certainly be harm to Allied and Allied's clients. Allied—and its many employees—would no longer be permitted to perform case management services in western Kentucky. Defendants argue that this could "expose Allied to regulatory noncompliance and destabilize case-management operations across the western Kentucky region." (Defs.' Supp. Br. 12). Medicaid clients depend on these case managers for services. (*See* TRO & Prelim. Inj. Hr'g at 3:37-40 PM). Moreover, these clients and their families form relationships with their case manager—one family member testified that her mother would be devastated if she had to find a new case manager. (TRO & Prelim. Inj. Hr'g at 3:40 PM).

Limiting the scope of the injunction would mitigate that harm—Khiyani has alternatively asked for an injunction that would only restrict Allied from taking on new case management clients. (TRO & Prelim. Inj. Hr'g at 4:06 PM). This would protect current clients and help mitigate

the harm to Allied. Thus, this factor strongly weighs against granting a broad injunction but has less weight when considering a narrower injunction.

### 4. *Public Interest*

"While it is true that the public has a general interest in seeing that reasonable non-compete agreements are enforced, the public also has an interest in 'allowing a successful salesman to continue performing his trade.'" *Apex Tool Grp., LLC v. Wessels*, 119 F. Supp. 3d 599, 610 (E.D. Mich. 2015) (citations omitted). Thus, courts may find that this factor is neutral in noncompetition cases. *See id.* Further, a sister court called the harm to the public from not enforcing contracts "largely notional." *Cretor Constr. Equip. LLC v. Gibson*, 738 F. Supp. 3d 950, 972 (S.D. Ohio 2024). In this instance "if the Court denies the request for injunctive relief, only to later determine that it erred in doing so, the public would not suffer any meaningful harm." *Id.* Indeed, clients seeking Medicaid services—"members of the public directly implicated by the Court's decision and therefore the ones who truly experience concretely the results of today's decision"—would not be harmed if an injunction is not enforced, but may be harmed if an injunction is enforced. *Id.* Thus, this factor weighs against Khiyani.

### 5. *Balancing the Factors*

Considering these four factors together, Khiyani has not met the heavy burden of establishing his entitlement to preliminary injunctive relief. His inability to demonstrate a likelihood of success on the merits alone would be enough to justify denying a motion for injunctive relief. While Khiyani may ultimately succeed on the merits of his claims, he has not shown that such an extraordinary remedy is warranted in this case.

### C. Plaintiff's Motions for Leave to Seal

In ruling on a motion to seal, courts "must balance the litigants' privacy interests against the public's right of access . . . ." *Rudd Equip. Co. v. John Deere Constr. & Forestry Co.*, 834 F.3d 589, 594 (6th Cir. 2016). "The public has an interest in ascertaining what evidence and records the District Court . . . ha[s] relied upon in reaching our decisions." *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1181 (6th Cir. 1983). There is a "strong common law presumption in favor of public access to court proceedings and records." *Id.* at 1179.

The strong presumption of public access can be overcome when certain interests are at issue, such as "privacy rights of participants or third parties, trade secrets and national security." *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179. "The party seeking to seal records has [a] heavy burden," in overcoming the presumption and must show: "(1) a compelling interest in sealing the records; (2) that the interest in sealing outweighs the public's interest in accessing the records; and (3) that the request is narrowly tailored." *Kondash v. Kia Motors Am., Inc.*, 767 F. App'x 635, 637-38 (6th Cir. 2019) (citing *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016)).

A motion to seal information does not overcome the presumption of public access just because it is unopposed. *Thornton v. Himmler*, No. 3:20-CV-P60-RGJ, 2021 U.S. Dist. LEXIS 108937, at *2 (W.D. Ky. June 10, 2021). "[T]he presumption that the public has the right to access judicial records does not vanish simply because all parties in the case agree that certain record should be sealed." *Kentucky v. Marathon Petroleum Co. LP*, No. 3:15-CV-354-DJH, 2018 WL 3130945 at *5 (W.D. Ky. June 26, 2018) (citing *Rudd Equip. Co.*, 834 F.3d at 595; *Shane Grp.*, 825 F.3d at 305).

12

Khiyani moves for leave to seal three unredacted documents: the Complaint, his memorandum in support of his motion for a temporary restraining order and preliminary injunction, and his supplemental memorandum in support of his motion for a temporary restraining order and preliminary injunction. (Pl.'s 1st Mot. Leave Seal, DN 6; Pl.'s 2d Mot. Leave Seal, DN 9; Pl.'s 3d Mot. Leave Seal, DN 23). Defendants do not oppose these motions.

Khiyani has met his burden to overcome the presumption of public access. As Khiyani notes, "courts have protected competitively sensitive financial and client information, especially when third-party privacy interests are implicated and targeted redactions are sufficient." (Pl.'s 1st Mot. Leave Seal 2); *see In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, No. 18-md-02818, 2023 WL 319922, at *4 (E.D. Mich. Jan. 19, 2023). Khiyani has a compelling interest in sealing these records because they contain sensitive information about the Companies' valuation, financial condition, and clients. That interest outweighs the public's interest in accessing the unredacted portions of these records. *See Gen. Motors*, 2023 WL 319922, at *4 (noting that the public "has a lesser interest in GM's internal financial information like that covered by the proposed redactions" because "detailed internal data and business information is not necessary for the public to understand any alleged wrongdoing in this case" (citation omitted)). Further, Khiyani's request is narrowly tailored, as Khiyani filed public versions of these documents with all non-public financial and client information redacted. Thus, it is appropriate to seal these unredacted documents.

### III. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.  Plaintiff's Motions for Leave to Seal (DN 6, 9, 23) are **GRANTED**.

      2.      Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (DN 8) is **DENIED**.

      3.      Defendants' Motion to File Belated Brief (DN 27) is **GRANTED**.

**Greg N. Stivers, Judge**
**United States District Court**
December 9, 2025

cc:    counsel of record